AMERICAN SHOW BAR SERIES, INC., doing business as Show Palace, Michael L. Grubb, and Linda A. Strouth, Plaintiffs/Counter-Defendants-Appellants,

v.

SULLIVAN COUNTY, Tennessee, Defendant/Counter–Plaintiff–Appellee.

Robert Walling doing business as Bottoms Up Club, Robert Walling and Linda A. Strouth, Plaintiffs/Counter–Defendants–Appellants,

v.

Sullivan County, Tennessee, Defendant/Counter–Plaintiff–Appellee;

State of Tennessee Attorney General, Intervenor–Appellee.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

March 15, 2000.

Application for Permission to Appeal Denied by Supreme Court Sept. 25, 2000.

Mark D. Slagle, T. Martin Browder, Jr., Slagle & Browder, PLLC, Johnson City, TN, for appellants American Show Bar Series, Inc., Grubb and Strouth.

John D. Parker, Jr., Kingsport, TN, for appellants Walling and Strouth.

Daniel P. Street, Blountville, TN, for appellee Sullivan County.

Paul G. Summers, Attorney General & Reporter, Michael E. Moore, Solicitor General, Steven A. Hart, Special Counsel, Office of the Attorney General, Nashville, TN, for appellee State of Tennessee Attorney General.

## OPINION

**SUSANO, J.**

■ The plaintiffs—American Show Bar Series, Inc., doing business as Show Palace and Michael L. Grubb (collectively "the Show Palace"), Robert Walling, individually and doing business as Bottoms Up Club (collectively "Bottoms Up Club"), and Linda A. Strouth—brought this action challenging the constitutionality of the Adult–Oriented Establishment Registration Act of 1998 ("the Act").[1] The defendant, Sullivan County ("the County"), counterclaimed, seeking injunctive relief and sanctions for violations of the Act by the plaintiffs. Following a bench trial, the trial court found the Act—save one provision—to be constitutional. The plaintiffs appeal, raising four issues for our consideration:

1. Does the Act violate the prohibition against retrospective laws found in Article I, Section 20 of the Tennessee Constitution?

2. Does the Act violate the First Amendment to the United States Constitution[2] or Article I, Section 19 of the Tennessee Constitution[3]?

3. Did the trial court err in excluding evidence regarding the allegedly improper motivation of certain state legislators and county commissioners in passing the Act?

4. Are certain provisions of the Act void for vagueness or unconstitutionally overbroad?

## I.

Grubb is the president and principal shareholder of American Show Bar Series, Inc., a corporation established in 1997, that operates the Show Palace, an adult-oriented establishment located in Sullivan County. The Show Palace features nude female dancers. The performers dance on a stage, at individual customers' tables, and in what is known as a "cage," a four-foot by five-foot booth partially enclosed by lattice. Prior to its opening in May, 1998, the Show Palace had obtained a general business license as well as a permit to sell beer.

Walling is the owner of the Bottoms Up Club, which has been in operation since 1994. The club is also located in Sullivan County and features nude dancing similar to that offered at the Show Palace. Although the Bottoms Up Club does not have a beer permit from the County, customers are permitted to bring or "brown bag" alcoholic beverages into the club. The parties stipulated at trial that both the Show Palace and the Bottoms Up Club are "adult-oriented establishments" within the meaning of the Act.

Strouth is an entertainer who has performed at both the Show Palace and the Bottoms Up Club. The parties stipulated that Strouth is an "entertainer" within the meaning of the Act.[4]

On July 20, 1998, the Sullivan County Commission adopted the Act as a county ordinance.[5] The Act establishes a regula-

---

1. T.C.A. § 7–51–1101, *et seq.* (1998).

2. The First Amendment, which provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech or of the press," is applicable to the states through the Fourteenth Amendment. *Davis–Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 523 (Tenn.1993).

3. Article I, Section 19 of the Tennessee Constitution provides that "[t]he free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any

subject, being responsible for the abuse of that liberty."

4. The Act defines an "entertainer" as "any person who provides entertainment within an 'adult-oriented establishment' as defined in this section, whether or not a fee is charged or accepted for entertainment and whether or not entertainment is provided as an employee, escort or an independent contractor." T.C.A. § 7–51–1102(10).

5. The Act has local effect only upon a two-thirds vote of the county legislative body. T.C.A. § 7–51–1120.

tory system applicable to adult-oriented establishments. It requires an adult-oriented establishment to obtain a license from the county's adult-oriented establishment board in order to operate. T.C.A. § 7–51–1104. It further requires that all entertainers, employees, and escorts employed by such an establishment obtain a work permit from the county. T.C.A. § 7–51–1115. The Act also imposes several regulations, including a prohibition against the serving or consuming of alcohol on the premises, T.C.A. § 7–51–1109(a)(5); a ban on the touching or the exposing of certain parts of the body, T.C.A. § 7–51–1114(b)–(c); and a requirement that all performances occur on an 18–inch high stage and be at least six feet from any other entertainer, employee, or customer, T.C.A. § 7–51–1114(c).

In November, 1998, the Show Palace and the Bottoms Up Club filed separate actions challenging the constitutionality of the Act and seeking a temporary injunction to prevent its enforcement. These actions were consolidated for trial. The plaintiffs allege, in pertinent part, (1) that the Act violates Article I, Section 20 of the Tennessee Constitution in that the Act retrospectively takes away their right to serve alcohol on their premises; (2) that the Act is in violation of the First Amendment; and (3) that several provisions of the Act are unconstitutionally vague or overbroad. The County filed a counterclaim seeking injunctive relief and sanctions for violations of the Act.[6]

At the conclusion of a three-day trial, the trial court announced its findings. First, the trial court upheld T.C.A. § 7–51–1109(a)(5), which provides that an adult-oriented entertainment license may be revoked, suspended or annulled if alcohol is served or consumed on the premises, finding that this provision is a valid exercise of the State's police power and thus does not violate Article I, Section 20 of the Tennessee Constitution, which prohibits retrospective laws. The trial court further found that the Act is a content-neutral regulation addressing the deleterious secondary effects of adult-oriented establishments, and that "none of the requirements of the ordinance and statute in question restrict the First Amendment rights of the Plaintiffs to a degree that is to a grade more than essential to accomplish the goal of attempting to prevent or stop the secondary effects." The trial court rejected plaintiffs' claims that several provisions of the Act are vague or overbroad. However, the trial court struck down T.C.A. § 7–51–1113(i), which requires the posting of a sign advising, among other things, that entertainers cannot demand or collect a fee before completion of the entertainment. The trial court found that this provision was "excess" because the Act, as enacted, does not prohibit the collection of fees during the course of a performance.[7]

Having found the Act to be constitutional,[8] with the exception of T.C.A. § 7–51–1113(i), the trial court granted the plaintiffs until February 15, 1999, to file applications for the appropriate licenses and permits required by the Act. The plaintiffs filed motions to amend and to stay the judgment, which were denied. This appeal followed.

## II.

---

6. The State of Tennessee Attorney General was permitted to intervene on December 23, 1998, in order to defend the constitutionality of the Act.

7. The attorney for the State indicated to the trial court that a prior version of the Act contained a provision prohibiting the collection of fees during a performance; however, that provision was deleted before enactment.

8. The trial court also upheld the constitutionality of the schedule of fees for permits and licenses under the Act, finding that the fees were reasonable in light of the reasonably anticipated costs of administration and enforcement. This ruling is not an issue on this appeal.

The Show Palace[9] argues that the Act is a retrospective law in violation of Article I, Section 20 of the Tennessee Constitution[10] because, so the argument goes, the effect of the Act is to deprive the Show Palace of its vested property right to sell beer on its premises. The Show Palace contends that it has a vested property right to sell beer because (1) the County had issued a beer permit to the Show Palace prior to the enactment of the Act; (2) the Show Palace had made a significant financial investment in reliance on that right; and (3) the County and the Show Palace had a "mutual understanding" that the Show Palace would be "permitted to operate in the manner in which it was established", that is, providing adult-oriented entertainment while also serving beer on its premises.

We reject the Show Palace's contention that it has a vested property right to sell beer. The mere issuance of a beer permit does not create a vested property right. *Needham v. Beer Bd. of Blount County*, 647 S.W.2d 226, 231 (Tenn.1983). A beer permit is merely a temporary permit, a privilege, to do what would otherwise be unlawful. *Id.* Nor does the fact that the Show Palace has made a significant financial investment in reliance on the beer permit create a protectable right. *See Chambers v. Peach County*, 268 Ga. 672, 492 S.E.2d 191, 193 (1997). Also, we do not find that a "mutual understanding" existed between the County and the Show Palace that the latter would always be entitled to offer both alcohol and nude dancing; neither the general business license nor the beer permit issued to the Show Palace confers the right to offer *both* adult entertainment and alcohol to its patrons. *See id.* (finding plaintiff did not have vested right to serve alcohol along with furnishing adult entertainment because none of plaintiff's licenses permitted

such conduct). Indeed, the Show Palace has not been deprived of its ability to sell beer—it has a valid beer permit. The Show Palace cannot, however, sell beer *and* offer adult-oriented entertainment.

Even if, as the Show Palace claims, the Act retrospectively denied its "right" to sell beer—and we have held that it did not—the constitutional prohibition against retrospective laws "does not inhibit retrospective laws made in furtherance of the police power of the state...." *Dark Tobacco Growers' Co-op. Ass'n v. Dunn*, 150 Tenn. 614, 266 S.W. 308, 312 (1924). The provision of the Act prohibiting the sale or consumption of alcohol on the premises of an adult-oriented establishment is a valid exercise of the police power. The sale of beer is "subject to the control of the State, or by delegation of power to its political subdivisions, such as counties or municipalities, in the exercise of the police power." *Henderson v. Grundy County Beer Comm.*, 176 Tenn. 397, 141 S.W.2d 901, 903 (1940). The inherent police power of the state permits the state to prohibit the sale of alcoholic beverages in "inappropriate places," such as establishments featuring nude dancing. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 515, 116 S.Ct. 1495, 1514, 134 L.Ed.2d 711 (1996); *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 995–96 (11th Cir.1998). Thus, even if the Show Palace did have a protectable right to sell beer, the Act's prohibition against alcohol is a valid exercise of the police power, and thus the claim that the Act violates Article I, Section 20 of the Tennessee Constitution is without merit.

### III.

The plaintiffs next contend that the Act violates the guarantees of free speech and free expression found in the

---

**9.** Because the Bottoms Up Club does not have a beer permit, this issue is not pertinent to its appeal.

**10.** Article I, Section 20 of the Tennessee Constitution provides "[t]hat no retrospective law, or law impairing the obligations of contracts, shall be made."

First Amendment of the United States Constitution and Article I, Section 19 of the Tennessee Constitution.[11]

### A.

■ Although nudity *per se* is not protected by the First Amendment, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211 n. 7, 95 S.Ct. 2268, 2273–74 n. 7, 45 L.Ed.2d 125 (1975), nudity may be integrated into constitutionally protected expressive conduct, such as a dance that conveys an erotic message. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 581, 111 S.Ct. 2456, 2468, 115 L.Ed.2d 504 (1991)(plurality opinion). Nude dancing, however, enjoys only minimal protection by the First Amendment. *Barnes*, 501 U.S. at 566, 111 S.Ct. at 2460 ("nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so"); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976)(plurality opinion)("society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate").

In *DLS, Inc. v. City of Chattanooga*, the Sixth Circuit interpreted *Barnes* to mean that not *all* nude dancing is protected speech as a matter of law, but rather that the determination of whether such dancing should be considered protected expressive conduct should be made on a case-by-case basis. 107 F.3d 403, 409 (6th Cir.1997). "In determining whether expressive activity is at issue, we are mindful that speech need not be limited to a particularized message, because such a limitation would exclude the unquestionably shielded painting of Jackson Pollack [sic], music of Arnold Schonberg [sic], or Jabberwocky verse of Lewis Carroll." *Id.* at 409 n. 5

(quoting *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569, 115 S.Ct. 2338, 2345, 132 L.Ed.2d 487 (1995)(internal quotation marks omitted)). Nevertheless, the *DLS* court assumed that the message conveyed by the nude dancing at issue was "an endorsement of erotic experience" and thus analyzed the constitutionality of the ordinance under the First Amendment. *DLS*, 107 F.3d at 409; *see also Threesome Entertainment v. Strittmather*, 4 F.Supp.2d 710, 717 (N.D.Ohio 1998)(proceeding under assumption that the nude dancing at issue sought to communicate "an endorsement of erotic experience"). Likewise, we will assume that the dancing that occurs at the plaintiffs' establishments in the instant case seeks to convey an erotic message that is, at least minimally, protected by the First Amendment.

### B.

■ As a threshold matter, we must determine if the Act is a "content-neutral" time, place, and manner regulation or if it is a "content-based" restriction. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). If the Act is targeted specifically at the content of the erotic message conveyed by such entertainment, then the Act is presumptively invalid and will be subject to strict scrutiny. *See id.* On the other hand, if the ordinance is "justified without reference to the content of the regulated speech," or the ordinance serves a purpose that is unrelated to the content of expressive conduct, the ordinance may be considered content-neutral. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Thus, if the Act is targeted at combating the negative secondary effects of the pro-

---

11. Article I, Section 19 of the Tennessee Constitution "should be construed to have a scope at least as broad as that afforded those freedoms by the first amendment of the United States Constitution." *Leech v. American Booksellers Ass'n, Inc.*, 582 S.W.2d 738, 745 (Tenn.1979).

tected expression, then the Act may be upheld as a reasonable time, place, and manner restriction. *See City of Renton,* 475 U.S. at 49, 106 S.Ct. at 929–30.

 We find that the Act is a content-neutral time, place, and manner regulation of adult-oriented establishments. The evidence presented at trial shows that the General Assembly and the Sullivan County Commission sought to combat the deleterious secondary effects associated with adult-oriented establishments, such as an increase in criminal activity and the spread of sexually transmitted diseases. The Preamble to the Act [12] recites several legislative findings, including findings that adult-oriented establishments contribute to (1) unlawful sexual activities, including prostitution; (2) a deleterious effect on surrounding businesses and residential areas; (3) increased crime; and (4) the decrease of surrounding property values. The Preamble also recites that the Act seeks

> to minimize and control these adverse effects and thereby protect the health, safety, and welfare of the citizenry; protect the citizens from increased crime, preserve the quality of life; preserve the property values and character of surrounding neighborhoods and deter the spread of urban blight. . . . .

The evidence also shows that at the meeting at which the County adopted the Act, a document was distributed to the members of the County Commission, detailing the findings of other local governments as well as findings incorporated into judicial decisions such as *City of Renton* and *Barnes* concerning the adverse secondary effects of adult-oriented establishments. Furthermore, the State and the County produced at trial over twenty studies conducted in cities such as Austin, Texas, Los Angeles, California, and Brighton, Colorado, that discussed the secondary effects of adult-oriented establishments in these communities. Because the evidence demonstrates that the Act was aimed at combating the deleterious secondary effects of adult-oriented establishments, we find that the Act is content-neutral.

The plaintiffs argue that the State and the County "are really attacking the protected activity rather than the alleged secondary deleterious effects." In support of this argument, the plaintiffs contend (1) that the County had already regulated adult-oriented businesses in such a way that there were no deleterious secondary effects; and (2) that while the Show Palace was in business, no deleterious secondary effects occurred.

 We reject the plaintiffs' argument. We have found more than sufficient evidence in the record to establish the deleterious secondary effects of adult-oriented establishments. A local government is not required to prove that such secondary effects have actually occurred in its communities; rather, a local government may rely upon the experiences and findings of other local governments in enacting its ordinance. *City of Renton,* 475 U.S. at 53, 106 S.Ct. at 931. As the Supreme Court in *City of Renton* noted:

> The First Amendment does not require a city, before enacting such an ordinance to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

475 U.S. at 51–52, 106 S.Ct. at 931. The evidence relied upon may be developed prior to the enactment of the ordinance or adduced at trial. *See Barnes,* 501 U.S. at 582, 111 S.Ct. at 2469 (Souter, J., concurring)("Our appropriate focus is not an empirical enquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental

---

12. The Preamble to the Act is set forth in Chapter 1090 of the Tennessee Public Acts of 1998. It was not codified in T.C.A. § 7–51– 1101, *et seq.;* however, the County adopted the Act as it is set forth in Chapter 1090.

interest in the service of which the challenged application of the statute may be constitutional."); *J & B Entertainment, Inc. v. City of Jackson,* 152 F.3d 362, 371 (5th Cir.1998). As discussed earlier, the State and the County presented to the trial court the evidence of deleterious secondary effects that was before the County Commission when it enacted the ordinance; also introduced at trial were several studies conducted by other local governments regarding their findings of the harmful secondary effects. We conclude that there is more than adequate evidence of the deleterious secondary effects of adult-oriented establishments to justify the Act.

The fact that deleterious secondary effects may not have occurred during the months that the Show Palace and Bottoms Up Club were in operation is irrelevant in determining the need for such an ordinance in Sullivan County. *See Barnes,* 501 U.S. at 584, 111 S.Ct. at 2470 (Souter, J., concurring)("legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects"). And contrary to the plaintiffs' assertion, there was ample evidence of the secondary effects in Sullivan County prior to the adoption of the Act. The record of 911 calls made in regards to the Bottoms Up Club indicate that since 1994, the club has allegedly been the site of nine incidents of public drunkenness, nine incidents of assault, seven incidents of theft, six incidents of vandalism, two incidents of domestic violence, and at least two incidents involving weapons. These are precisely the types of criminal activity that the Act is attempting to combat.

■ Plaintiffs further support their argument that the Act is not really directed at combating harmful secondary effects by arguing that there was significant political pressure exerted on the County to ban adult-oriented establishments and that the State and the County "hoped and [were] aware that there would be a significant and perhaps devastating financial impact on the affected business by the adoption of the regulations contained in the Act." The plaintiffs contend that the trial court erred in excluding the statements of two state senators, which statements, the plaintiffs argue, reveal the improper motivations behind the Act.

■ We find that the trial court correctly excluded this proffered evidence. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *United States v. O'Brien,* 391 U.S. 367, 384, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 (1968). Thus, the extraneous statements made by two legislators were properly excluded by the trial court as irrelevant and have no bearing on our analysis of the content-neutrality or the constitutionality of the Act.

C.

■ Having determined that the Act is content-neutral, we must now determine whether the Act is constitutional under the test set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673; 20 L.Ed.2d 672 (1968). In *O'Brien,* the Supreme Court held that a content-neutral statute passes constitutional muster if: (1) it is within the constitutional powers of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on First Amendment freedoms is *no greater than is necessary* to further that interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679.

■ The plaintiffs do not dispute that the Act is within the State's constitutional powers to protect public health, safety, and welfare; we find that this prong of *O'Brien* is satisfied. *See Threesome,* 4 F.Supp.2d at 720 (finding "protection of public health, safety, and welfare falls squarely within the constitutional police powers of local government"). We

also find that the second prong of *O'Brien* has been satisfied because there is a substantial governmental interest being served by the challenged provisions of the Act. Courts have consistently found that the prevention of crime and disease satisfies the second prong of the *O'Brien* test. *DLS,* 107 F.3d at 410; *BSA, Inc. v. King County,* 804 F.2d 1104, 1111 (9th Cir.1986)("[c]urtailing public sexual contact and sexual criminal offenses represents a significant state interest"); *Threesome,* 4 F.Supp.2d at 720 ("[t]here is also no question that prevention of crime and disease are important governmental interests").

■■■ We also find that the third prong of *O'Brien* is satisfied here. The combating of secondary effects of adult-oriented establishments is an interest that is not directly related to the suppression of protected speech. *See Barnes,* 501 U.S. at 585, 111 S.Ct. at 2470 (Souter, J., concurring)("on its face, the governmental interest in combating prostitution and other criminal activity is not at all inherently related to expression").

■■■ Thus, we confine our analysis to the fourth prong of *O'Brien,* that is, whether the incidental restrictions on First Amendment freedoms is no greater than necessary. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. The Supreme Court has interpreted this factor to mean that an ordinance must be "narrowly tailored" to serve the government's interest. *Barnes,* 501 U.S. at 571–72, 111 S.Ct. at 2463. As the Supreme Court stated in *Ward,*

> it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a man-

ner that a substantial portion of the burden on speech does not serve to advance its goals. So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

*Ward,* 491 U.S. at 798–99, 109 S.Ct. at 2757–58 (footnotes, internal quotation marks, and citations omitted). With these principles in mind, we will analyze each of the provisions of the Act challenged by the plaintiffs in order to determine whether the provisions satisfy the fourth prong of *O'Brien.*

### 1.

T.C.A. § 7–51–1105(b)(5) provides that an applicant for a license must list on the application "[a]ny conviction for or plea of nolo contendere to a specified criminal act as defined in § 7–51–1102(24) ." The plaintiffs contend that this is greater than necessary to further the government's interest because a plea of *nolo contendere* would not be grounds to deny a license or permit.

■■■ We find that the plaintiffs have failed to show that they have standing to challenge this particular provision. None of the plaintiffs have been convicted of, or entered pleas of *nolo contendere* to, any of the criminal acts specified in the Act. Because the plaintiffs would not be deprived of a license by operation of this provision, they lack standing to challenge it. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 234–35, 110 S.Ct. 596, 609, 107 L.Ed.2d 603 (1990); *Price v. State,* 806 S.W.2d 179, 181 (Tenn.1991).

■■■ Even if the plaintiffs did have standing, we cannot agree with their contention that a plea of *nolo contendere* would not constitute grounds for denying or revoking a license or permit. A license or permit may be denied or revoked if the

applicant is *convicted* of one of the Act's "specified criminal acts." T.C.A. §§ 7–51–1106(1)(D), 7–51–1109(a)(10). A plea of *nolo contendere* results in a conviction. *See Teague v. State,* 772 S.W.2d 932, 943 (Tenn.Crim.App.1988). Thus, this argument is without merit.

### 2.

■ T.C.A. § 7–51–1109(a)(5) provides that a license shall be revoked, suspended or annulled if "[a]ny intoxicating liquor or malt beverage is served or consumed on the premises of the adult-oriented establishment."

The Supreme Court has long upheld ordinances prohibiting an establishment from offering both alcohol and adult-oriented entertainment. *See California v. LaRue,* 409 U.S. 109, 118, 93 S.Ct. 390, 397, 34 L.Ed.2d 342 (1972)(finding the conclusion "that certain sexual performances and the dispensation of liquor by the drink ought not to occur at premises that have licenses was not an irrational one"); *New York State Liquor Authority v. Bellanca,* 452 U.S. 714, 718, 101 S.Ct. 2599, 2601, 69 L.Ed.2d 357 (1981)("Common sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior."). We do not find any constitutional infirmity in this provision.

### 3.

■ T.C.A. § 7–51–1111(a) provides that licenses will automatically terminate at the expiration of one year. T.C.A. § 7–51–1109(d) provides that "[a]ny operator whose license is revoked shall not be eligible to receive a license for five (5) years from the date of revocation." The plaintiffs contend that it is more burdensome than necessary to provide licenses for one year but allow licenses to be revoked for up to five years.

In light of the government's interest in preventing crime, we do not find that this provision is any greater than necessary to achieve that interest. Again, we are mindful that *O'Brien* does not require the use

of the "least restrictive or least intrusive means." *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. Accordingly, we will not question the Legislature's decision to provide for revocations for up to five years.

### 4.

■ T.C.A. § 7–51–1113(a) provides as follows:

> The operator shall maintain a register of all employees, showing the name, the aliases used by the employee, home address, age, birth date, sex, height, weight, color of hair and eyes, telephone number, social security number, driver license number, date of employment and termination, and duties of each employee, and such other information as may be required by the board. The above information on each employee shall be maintained in the register on the premises for a period of three (3) years following termination.

The evidence produced at trial showed that hundreds of entertainers perform in the plaintiffs' establishments every year, sometimes for only a few days, and in some instances only one night. The State contends that the register is necessary to determine "what entertainers toured there, when, and whether they have proper permits." We do not find this provision to be more burdensome than necessary in furthering that interest. Accordingly, we find that this provision is constitutional.

### 5.

■ T.C.A. § 7–51–1113(i) provides as follows:

> A sign shall be conspicuously displayed in the common area of the premises, and shall read as follows:
>
> "This Adult–Oriented Establishment is Regulated by Tennessee Code Annotated, Title 7, Chapter 51, Sections 1101 through 1120. Entertainers are:
>
> (1) Not permitted to engage in any type of sexual conduct;

(2) Not permitted to expose their sex organs;

*(3) Not permitted to demand or collect all or any portion of a fee for entertainment before its completion;*

(4) Not permitted to appear in a state of full nudity."

(Emphasis added). The trial court struck this provision from the Act, because the sign advises that the collection of fees during a performance is prohibited. It did so because there is no prohibition of such conduct in the Act. We find that this provision should be struck from the Act and thus affirm the trial court on this issue.

### 6.

■ T.C.A. § 7–51–1114 lists a series of "prohibited activities" and provides, in pertinent part, as follows:

(b) No operator, entertainer or employee of an adult-oriented establishment shall encourage or permit any person upon the premises to touch, caress or fondle the breasts, buttocks, anus or genitals of any operator, entertainer or employee.

(c) No entertainer, employee, or customer shall be permitted to have any physical contact with any other on the premises during any performance and all performances shall only occur upon a stage at least eighteen (18″) above the immediate floor level and removed at least six feet (6″) [sic] from the nearest entertainer, employee, and/or customer.

(d)(1) No employee or entertainer, while on the premises of an adult-oriented establishment, may:

\* \* \*

(C) Appear in a state of nudity;

\* \* \*

(2) For the purpose of this section, "nudity" means the showing of the human male or female genitals or pubic area with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

The plaintiffs argue that the prohibition against touching "*in addition* to requiring six foot distances *and* a heightened stage of at least eighteen inches, *piled on top of* a requirement that entertainers not dance with anything less than a fully opaque covering" is more burdensome than necessary. Each of these regulations individually have been upheld by other courts. For example, prohibitions against touching have been found to be constitutional. *See Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1253 (5th Cir.1995)(holding "no touch" provision not overbroad and does not burden more protected expression than necessary); *2300, Inc. v. City of Arlington,* 888 S.W.2d 123, 129 (Tex.Ct.App.1994)(upholding "no touching" provision). Buffer zones and heightened stage requirements have also been deemed valid. *See Colacurcio v. City of Kent,* 163 F.3d 545, 553 (9th Cir.1998)(ten-foot buffer zone); *DLS,* 107 F.3d at 412–13 (six-foot buffer zone); *BSA,* 804 F.2d at 1111 (holding 18–inch high stage and 6–foot distance furthers government interest in preventing public sexual contact and sexual criminal offenses); *Ino Ino, Inc. v. City of Bellevue,* 132 Wash.2d 103, 937 P.2d 154, 169 (1997)(en banc)(finding four-foot buffer zone "facilitates the detection of public sexual contact and discourages contact from occurring in the first place"), *cert. denied,* 522 U.S. 1077, 118 S.Ct. 856, 139 L.Ed.2d 755 (1998); *City of Colorado Springs v. 2354, Inc.,* 896 P.2d 272, 297–98 (Colo.1995)(en banc)(three-foot buffer zone). Also, a prohibition against total nudity has been found to be valid. The United States Supreme Court in *Barnes* upheld a prohibition against total nudity, noting that "the requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic." *Barnes,* 501

U.S. at 571, 111 S.Ct. at 2463. We do not find that the cumulative effect of these valid regulations renders the Act constitutionally invalid.

## IV.

■ The First Amendment requires that statutes that impinge on the area of freedom of expression must have a greater degree of specificity than in other contexts, so that citizens are not "chilled" from exercising their constitutional right to free expression. *Davis–Kidd Booksellers, Inc. v. McWherter,* 866 S.W.2d 520, 531 (Tenn. 1993). The plaintiffs argue that several provisions of the Act effectively "chill" the exercise of constitutionally protected conduct occurring in their establishments. They argue that these provisions are unconstitutional because they are vague or overbroad.

■ "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). An ordinance is unconstitutionally vague when a person of "common intelligence must necessarily guess at its meaning." *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973)(quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). To avoid unconstitutional vagueness, a statute "must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Davis–Kidd,* 866 S.W.2d at 532 (quoting *Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). As the Tennessee Supreme Court noted in *Davis–Kidd,*

> [a]lthough the doctrine focuses both on actual notice to citizens and arbitrary enforcement, the [United States] Supreme Court has recognized that the more important aspect of the vagueness

doctrine is not actual notice, but the other principle [sic] element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.

*Davis–Kidd,* 866 S.W.2d at 532.

■ A statute is overbroad when it poses "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129, 135 (6th Cir.1994)(quoting *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)). In *Triplett Grille,* the Court of Appeals for the Sixth Circuit struck down an ordinance for overbreadth because it banned "all public nudity, including live performances with serious literary, artistic, or political value." 40 F.3d at 136. The Court held that the ordinance, which contained no limiting provisions, "sweeps within its ambit expressive conduct not generally associated with prostitution, sexual assault, or other crimes." *Id.* A statute that is not directed at protected expression but rather the manner in which that expression is presented may be overbroad only if the overbreadth is "real" and "substantial" in relation to the statute's "plainly legitimate sweep." *Davis–Kidd,* 866 S.W.2d at 525–26. If a statute is "readily susceptible" to a narrowing construction that would salvage its constitutionality, the statute will be upheld. *Id.* at 526 (quoting *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 397, 108 S.Ct. 636, 644–45, 98 L.Ed.2d 782 (1988)).

With these principles in mind, we will now analyze each of the provisions challenged by the plaintiffs.

## A.

■ T.C.A. § 7–51–1102(23) defines "specified anatomical areas" as follows:

(A) Less than completely and opaquely covered:

(i) Human genitals;

(ii) Pubic region;

(iii) Buttocks; and

(iv) Female breasts below a point immediately above the top of the areola; and

(B) Human male genitals in a discernibly turgid state, even if completely opaquely covered....

The plaintiffs contend that " 'specified anatomical areas' ... are not referred to at any other place in the Act but could conceivably be used to limit and/or chill plaintiffs' protected freedom of expression."

The term "specified anatomical areas" is used throughout the definition section in describing the types of entertainment and establishments that are subject to regulation under the Act. *See* T.C.A. §§ 7–51–1102(3)(defining "adult entertainment"); 7–51–1102(4)(defining "adult mini-motion picture theater"); 7–51–1102(5)(defining "adult motion picture theater"). It is undisputed that the plaintiffs' establishments are subject to regulation under the Act; thus, we cannot see how such a definition could be used to "chill" the plaintiffs' expression.

## B.

Next, the plaintiffs challenge several provisions on the basis that the provisions permit the County to make "subjective determinations" as to what constitutes grounds for the denial, revocation, suspension or annulment of a license. Specifically, the plaintiffs challenge T.C.A. §§ 7–51–1105(d)(failure or refusal to provide information relevant to investigation of application; failure to appear under oath regarding application; refusal to submit to or cooperate with investigation); 7–51 – 1109(a)(1)(providing false or misleading information on the application); 7–51–1109(a)(9)(failing to maintain premises in "clean, sanitary and safe condition"); 7–51–1113(e)(allowing a minor to loiter on the premises); 7–51–1113(f)(failing to keep all areas in which entertainment is being provided visible from common areas of the premises).

We have reviewed the terms in each of these provisions, mindful that "we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300. We find that the terms sufficiently define what conduct is prohibited. *See Davis–Kidd,* 866 S.W.2d at 532. Furthermore, we do not find that the provisions are written in such a way as to encourage arbitrary and discriminatory enforcement. *Id.* These provisions do not prohibit the plaintiffs "from communicating [their] desired message." *Threesome,* 4 F.Supp.2d at 726. We do not find that these provisions are unconstitutionally vague.

## C.

The plaintiffs contend that T.C.A. § 7–51–1114(c), which requires all performances to occur at least six feet away from any other entertainer, employee or customer, is unreasonable and overbroad in that it creates a chilling effect on persons engaged in protected activity.

We do not find the six-foot buffer zone to be overbroad. As the *Threesome* court noted:

> Although it is true that a patron's experience of the dancer's message "is more intense, more personal, more erotic if the dancer is close," it remains also true that "there is nothing in constitutional jurisprudence to suggest that patrons are entitled under the First Amendment to the maximum erotic experience possible."

*Threesome,* 4 F.Supp.2d at 724 (quoting *Colacurcio,* 944 F.Supp. at 1476). We therefore find no constitutional infirmity in the six-foot buffer zone.

## V.

The judgment of the trial court is in all respects affirmed. Costs on appeal are taxed to the appellants. This case is re-

manded for collection of costs assessed below, pursuant to applicable law.

GODDARD, P.J., and FRANKS, J., concur.