RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0406p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ENTERTAINMENT PRODUCTIONS, INC., et al.,
          *Plaintiffs-Appellants,*

*v.*

No. 08-5494

SHELBY COUNTY, TENN., et al.,
          *Defendants-Appellees,*

ROBERT E. COOPER, JR., Attorney General,
          *Intervenor Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 08-02047—Bernice B. Donald, District Judge.

Argued: April 20, 2009

Decided and Filed: November 25, 2009

Before: BOGGS, MOORE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** J. Michael Murray, BERKMAN, GORDON, MURRAY & DeVAN, Cleveland, Ohio, for Appellants. Robert B. Rolwing, ASSISTANT COUNTY ATTORNEY, SHELBY COUNTY GOVERNMENT, Memphis, Tennessee, Steven A. Hart, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. **ON BRIEF:** J. Michael Murray, Raymond V. Vasvari, Jr., BERKMAN, GORDON, MURRAY & DeVAN, Cleveland, Ohio, for Appellants. Robert B. Rolwing, ASSISTANT COUNTY ATTORNEY, SHELBY COUNTY GOVERNMENT, Memphis, Tennessee, Steven A. Hart, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, Thomas Roane Waring III, CITY ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellees.

      BOGGS, J., delivered the opinion of the court, in which SUTTON, J., joined. MOORE, J. (p. 32), delivered a separate opinion concurring only in the judgment.

1

_____

## OPINION

_____

BOGGS, Circuit Judge. Plaintiffs-Appellants Entertainment Productions, Inc., et al. filed suit to challenge the constitutionality of the Tennessee Adult-Oriented Establishment Registration Act ("Act" or "Tennessee Act") on First Amendment grounds. Plaintiffs appeal from a district court's denial of a preliminary injunction against the enforcement of the Tennessee Act in Shelby County. Plaintiffs claim that the Tennessee Act is unconstitutional on four grounds. First, Plaintiffs contend that the definitions of "adult cabaret," "adult-oriented establishment," and "adult entertainment" render the Act unconstitutionally overbroad, and second, that these definitions are vague. Third, Plaintiffs argue that prohibitions on certain kind of physical contact on the premises of an adult-oriented establishment are overbroad. Fourth, Plaintiffs claim that the Tennessee Act will substantially diminish the availability of adult speech in Memphis, Shelby County. Plaintiffs conclude that the district court erred in determining both that Plaintiffs did not demonstrate a substantial likelihood of success on the merits of their claims and that the balancing of equities disfavored a preliminary injunction. We affirm the district court's denial of the preliminary injunction.

## I

This case presents a constitutional challenge to the Tennessee Adult-Oriented Establishment Registration Act of 1998, Tenn. Code Ann. § 7-51-1101 *et seq.* The Tennessee Act is a county-option state law, enacted to address the recognized negative secondary effects associated with "adult" or sexually oriented businesses, including crime, spread of sexually transmitted diseases, lowering of property values, and other related public welfare and safety issues. The Act sets up a licensing scheme for sexually oriented businesses, prohibits certain activities on the premises of such businesses, and regulates the manner in which entertainment may be presented therein. The Act enters into effect in a particular county after "a two-thirds (2/3) vote of the county legislative body adopting this part." Tenn. Code Ann. § 7-51-1120. On September 13, 2007, Shelby County's Ordinance

344 ("Ordinance") adopted the Tennessee Act in Shelby County. The Ordinance relied on Tennessee's legislative findings of "deleterious secondary effects commonly associated with adult-oriented establishments, including but not limited to an increase in crime, the spread of sexually-transmitted diseases, the downgrading of property values, and other public health, safety, and welfare issues." Pursuant to the Ordinance, the Act entered into effect in Shelby County on January 1, 2008, but provided a 120-day "grace period" to allow businesses and employees to obtain licenses required by the Act.

The Act regulates all establishments that conform to a statutory definition of "adult-oriented establishment" in two general ways. First, all businesses subject to the Act, as well as their employees and entertainers, must obtain a license or a permit. Second, the Act regulates the manner in which entertainment may be provided by adult-oriented establishments: it prohibits nudity, certain sexual activities, certain kinds of physical contact, and requires that all performances take place on a stage at least 18 inches above floor level and that all performers stay at least six feet away from customers, employees and other performers.

Plaintiffs operate a "substantial fraction" of the nightclubs in Memphis, Shelby County. On January 25, 2008 – prior to the expiration of the 120-day grace period for obtaining licenses – Plaintiffs filed suit in the United States District Court for the Western District of Tennessee against Shelby County and the City of Memphis, seeking injunctive relief and a declaratory judgment. Tennessee's Attorney General, Robert E. Cooper, Jr., was granted leave to intervene to defend the constitutionality of the Act (Shelby County, the City of Memphis, and the Attorney General are collectively referred to as "Defendants"). After a preliminary injunction hearing, the district court denied the requested injunction on the basis that Plaintiffs did not demonstrate a substantial likelihood of success on the merits of their claims.[1] Plaintiffs now appeal from that decision.

---

[1] However, the district court granted Plaintiffs' subsequent motion for an injunction pending this appeal.

**II**

**A**

A district court's denial of injunctive relief is normally reviewed for an abuse of discretion. *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007). The district court considers and balances four factors in making its decision: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Ibid.* (quoting *City of Littleton v. Z. J. Gifts D-4, L.L.C.*, 541 U.S. 774, 784 (2004)). The first factor is crucial in First Amendment cases because public interest and harm to the parties largely depend on the constitutionality of the challenged law. The first factor presents a "purely legal question of whether the district court improperly applied governing law or used an erroneous legal standard," which we review *de novo. Ibid.* (internal quotation marks and citations omitted).

**B**

This court has repeatedly faced challenges to the constitutionality of state and local regulations of sexually or adult-oriented establishments. We recognize that such regulations tend to abridge the opportunities for the communication and reception of "at least two protected categories of speech: first, sexually explicit but non-obscene speech, such as adult publications and adult videos, and second, 'symbolic speech' or 'expressive conduct,' such as nude [or nearly nude] dancing." *Richland Bookmart, Inc. v. Knox County, Tenn.*, 555 F.3d 512, 520 (6th Cir. 2009); *see also Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 396 (6th Cir. 2001). Notwithstanding the protection accorded to erotic expression by the First Amendment, the Supreme Court has held that governments may adopt measures intended to ameliorate the adverse secondary effects of such expression, so long as the restrictions placed on expression survive intermediate scrutiny as set forth in *United States v.*

*O'Brien*, 391 U.S. 367, 377 (1968), and *City of Renton v. Playtime Theatres*, 475 U.S. 41, 47 (1986).   Restrictions on sexually explicit expression are constitutionally permissible if: they further a substantial governmental interest "unrelated to the suppression of free expression," *O'Brien*, 391 U.S. at 377 – specifically, the amelioration of adverse secondary effects associated with adult establishments; they are narrowly tailored; and they "do not unreasonably limit alternative avenues of communication," *Renton*, 475 U.S. at 47.  *See Richland Bookmart*, 555 F.3d at 520-22.

In accordance with *O'Brien*, *Renton*, and their progeny, we have declined to uphold  particular regulatory measures, for which no substantial governmental interest unrelated to the suppression of speech was proffered, that burdened more speech than necessary in a manner unconnected to the interest in controlling secondary effects, and/or which unreasonably limited the avenues of communication for adult-oriented speech.  *See, e.g., Hamilton's Bogarts, Inc.*, 501 F.3d at 654; *Exec. Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 798-99 (6th Cir. 2004); *see also 729, Inc. v. Kenton County Fiscal Court*, 515 F.3d 485, 504 (6th Cir. 2008).

In the present case, Plaintiffs do not argue that the application of the Tennessee Act to their establishments does not satisfy intermediate scrutiny under *O'Brien* and *Renton*.[2]   Indeed, because the Act has not yet been enforced against Plaintiffs, they challenge key provisions of the Act as overly broad and/or vague, and maintain that nothing short of facial invalidation will remedy the chilling effect created by the threat of its unconstitutional applications.

In the context of the First Amendment, the chief evil of overly broad laws consists in the chilling effect they produce on protected expression.  For this reason, the

---

[2]Nor would such a claim be likely to meet with success, in light of the decision of the Tennessee Court of Appeals in *American Show Bar Series, Inc. v. Sullivan County*, 30 S.W.3d 324 (Tenn. Ct. App. 2000), *perm. app. denied*, 2000 Tenn. LEXIS 543 (Tenn. Mar. 15, 2000), which held that the Act was constitutional as applied to similarly situated plaintiffs.  That court determined that the Act is a content-neutral time, place, and manner regulation of adult-oriented establishments, *id*. at 334, and that a number of challenged provisions survived intermediate scrutiny under *O'Brien*, including the provisions regarding prohibited activities, to which present Plaintiffs now bring a facial challenge on overbreadth grounds. *Id*. at 338-39.

Supreme Court has relaxed the traditional rules of standing: plaintiffs are permitted "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 348 (6th Cir. 2007) (internal quotation marks omitted) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Thus, when a law "'prohibits a substantial amount of protected speech' both 'in an absolute sense' and 'relative to the statute's plainly legitimate sweep,'" the overbreadth doctrine dictates wholesale invalidation. *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) (quoting *United States v. Williams*, 128 S. Ct. 1830, 1838 (2008)). In the context of adult-oriented business regulations, "the overbreadth doctrine guards against the suppression of protected speech unconnected to the negative secondary effects cited as legislative justification." *Schultz v. City of Cumberland*, 228 F.3d 831, 849 (7th Cir. 2000) (citing *Tunick v. Safir*, 209 F.3d 67, 83 (2d Cir. 2000); *see also Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 135 (6th Cir. 1994)).

Facial invalidation of a law is, as the Supreme Court and this court repeatedly noted, "strong medicine," as "'[s]ubstantial social costs' are incurred by preventing the 'application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct.'" *Richland Bookmart, Inc.*, 555 F.3d at 532 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)). Therefore, the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial," *Williams*, 128 S. Ct. at 1838, and cautioned that invalidation for overbreadth be deployed sparingly and "only as a last resort," *Broadrick,* 413 U.S. at 613. Only if a plaintiff demonstrates "from the text of [the statute] and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally," is facial invalidation on overbreadth grounds appropriate. *Richland Bookmart, Inc.*, 555 F.3d at 532 (alteration in original) (quoting *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988)).

The void-for-vagueness doctrine and the overbreadth doctrine vindicate overlapping values in First Amendment jurisprudence. In general, vague laws fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," risk "trapping the innocent," and create a danger of "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). When a law implicates First Amendment freedoms, vagueness poses the same risk as overbreadth, as vague laws may chill citizens from exercising their protected rights. Accordingly, the Supreme Court has indicated that "stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech." *Smith v. California*, 361 U.S. 147, 151 (1959). "Although ordinarily '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,' we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Williams*, 128 S. Ct. at 1845 (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95 & nn.6 &7 (1982)).

This court has not shied away from invalidating a regulatory scheme in its entirety when the threat of impermissible applications and the consequent chilling effect unambiguously warranted this remedy. *See Odle v. Decatur County*, 371 F.3d 386, 395, 399 (6th Cir. 2005) (holding that a Decatur County ordinance, which prohibited, *inter alia*, nudity and the performance of arguably sexually suggestive acts in any place where liquor was sold, served or consumed, was overbroad because "it reache[d] a wide swath of public places likely to present performances not usually attended by harmful secondary effects"); *Triplett Grille*, 40 F.3d at 136 (holding that the Akron public indecency ordinance was unconstitutionally overbroad because it prohibited nudity in all public places, without excepting "live performances with serious literary, artistic, or political value"). Our decisions are also in harmony with other circuits' disposition of similar challenges. *See, e.g.*, *Conchatta Inc. v. Miller*, 458 F.3d 258, 266 (3d Cir. 2006) (holding that a Pennsylvania regulation prohibiting "lewd" entertainment is

unconstitutionally overbroad because it applied to all venues holding liquor licenses as well as those "operat[ing] in connection" with the licensed premises, sweeping in "a variety of performances that are entitled to the full protection of the First Amendment"); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 510, 516 (4th Cir. 2002) (holding that plaintiffs are likely to succeed in their overbreadth challenge to a North Carolina secondary-effects regulation because it applied to all establishments licensed to sell alcohol, "sweep[ing] far beyond bars and nude dancing establishments" and reaching "much other mainstream entertainment," with no evidence offered to connect the proscribed activities in mainstream venues to adverse secondary effects); *Ways v. City of Lincoln*, 274 F.3d 514, 519 (8th Cir. 2001) (holding that an ordinance is unconstitutionally overbroad because it reached beyond adult entertainment establishments to regulate conduct in "any business or commercial establishment," including "theater performances, ballet performances, and many other forms of live entertainment" not recognized to cause harmful secondary effects).

The facial attacks in *Odle*, *Triplett Grille*, *Conchatta*, *Carandola*, and *Ways* succeeded because the challenged statutes purported to regulate public venues that stage mainstream performances of artistic value, as well as venues that stage adult-oriented performances. In these cases, the "strong medicine" of facial invalidation was warranted because casting so wide a regulatory net would certainly chill protected artistic expression that was not shown to produce the same adverse secondary effects associated with adult entertainment. Moreover, the challenged statutes were not "readily susceptible" either to a narrowing construction that would limit the regulatory scope to adult-oriented establishments or to a limitation by severance of problematic provisions. *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988). To demonstrate a substantial likelihood of success on the merits of the present claims, therefore, the Plaintiffs must establish that the allegedly unconstitutional provisions of the Tennessee Act result in a real and substantial number of impermissible applications that chill protected expression, that the statutory language is not readily susceptible to a limiting

construction, and that any problematic provisions may not be severed because they are "an integral part of the [Act] viewed in its entirety," *Schultz*, 228 F.3d at 853.

## C

In their first argument, Plaintiffs assert unconstitutional overbreadth on the basis of the three definitions that identify the set of establishments to which the Act applies. The licensing and other regulations contained in the Act apply to "adult-oriented establishments," which include "adult cabarets." Moreover, Plaintiffs claim that the category of "adult-oriented establishments" also includes *any* establishment that is open to the public and presents "adult entertainment" for profit. The three definitions – "adult-oriented establishment," "adult cabaret," and "adult entertainment" – render the Act overbroad, according to Plaintiffs, because they serve to prohibit and regulate expression "not only within adult establishments, but also in a wide variety of venues with neither an actual nor an alleged link to the adverse secondary effects attributed to adult expression." Appellants' Br. at 13.

Our "first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams*, 128 S. Ct. at 1838. We proceed, therefore, to construe each term challenged by Plaintiffs.

**"Adult Cabaret"**

An "adult cabaret" is an "adult-oriented establishment" subject to licensing and regulation under the Act, and is separately defined as follows:

> "Adult cabaret" means an establishment that features as a principal use of its business, entertainers, waiters, or bartenders who expose to public view of the patrons within such establishment, at any time, the bare female breast below a point immediately above the top of the areola, human genitals, pubic region, or buttocks, even if partially covered by opaque material or completely covered by translucent material, including swim suits, lingerie, or latex covering. "Adult cabaret" includes a commercial establishment that features entertainment of an erotic nature,

including exotic dancers, strippers, male or female impersonators, or
    similar entertainers;

Tenn. Code Ann. § 7-51-1102(2). Plaintiffs identify three reasons why the set of
establishments swept into the Act's regulatory scheme by this definition results in
overbreadth.

First, Plaintiffs argue that the statutory reference to "*a* principal use," rather than
"*the* principal use," expands the Act's regulatory reach to multi-use and mainstream
establishments. Appellants' Br. at 34. "Adult cabarets," on Plaintiffs' reading, include
cabarets that have several uses, of which presentation of semi-nude entertainment is just
one, as well as mainstream dramatic or artistic venues. The latter venues will fall within
the definition of "adult cabaret," Plaintiffs insist, because "substantial runs of a drama,
music or dance program . . . – which contain nudity and thus can make the venue in
which they are performed into an adult cabaret – go on for long periods, turning that
performance into a substantial, and thus a principal use of the venue." Appellants' Br.
at 35.

While article choice ought not be ignored in statutory interpretation, the chosen
article is not the only or overriding signal of a statute's meaning. In this case, the
common definition of the succeeding term ("principal") diminishes the significance of
the indeterminate article. As the district court noted, "principal" means "*most* important,
consequential, or influential." (quoting *Webster's Third New International Dictionary*
1802 (3d ed. 1993) (emphasis added)).[3] In light of this definition, the substantive import
of the alleged distinction between "*the most* important" and "*a most* important" use of
a business is negligible.

Even if this provision is read to include establishments with several "principal
uses" of equal importance, we are not persuaded that entertainers' exposure of specified

---

[3]Unlike a number of other statutes we have encountered, the Tennessee Act does not define
"principal use," which leaves its interpretation to the common definition of the term. *Cf. Richland
Bookmart, Inc. v. Knox County, Tenn.*, 555 F.3d 512, 519 (6th Cir. 2009) (scrutinizing an ordinance that
defined "principal business purpose" to mean, *inter alia*, 35% or more of displayed merchandise or its
value, revenues, or interior business space).

anatomical areas in the course of a performance would ever plausibly describe "a principal use" of theatrical, musical or similar mainstream artistic venues. A "run" of a performance, however long, that contains nudity, does not transform such a venue into an adult cabaret because no *specific* play, opera or ballet is commonly deemed to be "a principal use" of a venue.[4] With regard to establishments that are devoted to multiple uses of equal importance, one of which is admittedly adult entertainment, their inclusion under the Act's regulatory scheme would not violate the First Amendment. Neither this court nor the Supreme Court has required that regulatory efforts to address secondary effects of sexually oriented businesses must be confined to establishments that accord unequivocal priority to adult entertainment over all other business uses. The crucial inquiry in determining the permissible reach of such regulations is whether the government relied on evidence reasonably believed to be relevant in identifying the set of businesses that generate adverse secondary effects. Given the documented evidence of such effects examined by Tennessee, Shelby County, as well as other jurisdictions, it is not unreasonable to conclude that an establishment with more than one principal use – for instance, semi-nude dancing and food service – is as liable to produce negative externalities as an establishment wholly devoted to presenting semi-nude dancing.[5]

Second, Plaintiffs argue that "the sorts of entertainment listed in the second sentence of § 7-51-1102(2) are intended to augment, and not exemplify, the first," which sweeps in mainstream establishments without requiring that "entertainment of an erotic nature" be their principal use. Appellants' Rep. Br. at 6-7, 35. We disagree. The second sentence merely lists examples of the kind of entertainment that may fit the definition set forth in the first sentence. Plaintiffs object that the list of entertainers in the second sentence "may or may not exemplify the first": "There is no requirement,

---

[4]It would be odd to say that a presentation of *Salomé*, rather than operatic performances generally, is a principal use of an opera house.

[5]We have previously upheld various regulations applicable to similarly defined establishments, even if we did not confront an identical challenge to the definition. In *DLS, Inc. v. City of Chattanooga*, for instance, this court upheld a similar licensing and regulation scheme that applied to "establishment[s] which feature[] as a principle [sic] use of its business" entertainers or employees who expose the same anatomical areas specified in the provision at bar. 107 F.3d 403, 406 (6th Cir. 1997).

rule or practice which says that a female impersonator will appear, for example, in lingerie or with bare breasts, or that a bared buttock[] is a necessary element of entertainment 'of an erotic nature'." Appellants' Rep. Br. at 7.

It is probably true that some performances by the entertainers listed in the second sentence bear no relation to the secondary effects the Act seeks to control. This, however, presents no difficulties of interpretation of the kind Plaintiffs evoke. Read naturally, a "commercial establishment that features entertainment of an erotic nature" by any of the listed performers is an "adult cabaret" under the Act *only* if entertainment by these performers is a principal use of the business *and* if their attire exposes the anatomical areas specified in the first sentence. Read in this manner, the Act does not burden a substantial amount of protected expression unrelated to secondary effects.[6]

Third, Plaintiffs claim that the Act impermissibly regulates erotic dance performances by "clothed" dancers, which are unconnected to the adverse secondary effects the Act purports to address. *Id.* at 39. By "clothed," Plaintiffs mean entertainers who are distinctly not nude, but are clad in "bikinis, swimsuits, and other materials which, while opaque, do not completely cover the entire buttocks, or all portions of the breast below the topmost portion of the areola." *Id*. at 40. The theory that underlies this claim – that burdening performances put on by entertainers so attired constitutes an unconstitutional application of a secondary-effects regulation – was addressed and rejected by this court in *Richland Bookmart*. 555 F.3d at 529-30.

In that case, we explained that in view of the evidence of secondary effects relied on by Knox County, as well as numerous other local and state governments promulgating similar regulations, "'it was reasonable for the City to conclude that establishments featuring performers in attire more revealing than bikini tops pose the same types of problems associated with other [sexually oriented businesses]'." 555 F.3d

---

[6]Because we find that the second sentence does not augment the complete definition of "adult cabaret" contained in the first sentence, we find it unnecessary to address Plaintiffs' further arguments about the inadequacy of the word "feature" as an alternative source of a limiting construction. See Appellants' Rep. Br. at 8.

at 529 (quoting *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 482 (5th Cir. 2002)) (alteration in original). We held that the regulation of adult cabarets featuring "semi-nude" performers[7] survived intermediate scrutiny because it did not impose a "substantial portion of the regulatory burden on protected speech without advancing the goals of the Ordinance." *Id.* at 530. Thus, imposing comparable burdens on a substantially overlapping set of cabarets cannot form a basis for a successful facial challenge. We are persuaded that the term "adult cabaret" does not render the Act overly broad.

### "Adult-oriented establishment" and "Adult entertainment"

Next, Plaintiffs argue that the definitions of "adult entertainment" and "adult-oriented establishment" jointly render the Act unconstitutionally overbroad in its scope. "Adult-oriented establishment" is given a long, tri-partite definition:

> "Adult-oriented establishment" includes, but is not limited to, an adult bookstore, adult motion picture theater, adult mini-motion picture establishment, adult cabaret, escort agency, sexual encounter center, massage parlor, rap parlor, sauna;

> further, "adult-oriented establishment" means any premises to which the public patrons or members are invited or admitted and that are so physically arranged as to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises for the purpose of viewing adult-oriented motion pictures, or wherein an entertainer provides adult entertainment to a member of the public, a patron or a member, when such adult entertainment is held, conducted, operated or maintained for a profit, direct or indirect.

> "Adult-oriented establishment" further includes, without being limited to, any adult entertainment studio or any premises that is physically arranged and used as such, whether advertised or represented as an adult entertainment studio, rap studio, exotic dance studio, encounter studio,

---

[7]The Knox County Ordinance applied to establishments that "regularly feature[] persons who appear semi-nude," where "semi-nudity" meant "the showing of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or the showing of the male or female buttocks. This definition shall include the lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breasts exhibited by a bikini, dress, blouse, shirt, leotard, or similar wearing apparel provided the areola is not exposed in whole or in part." *Richland Bookmart*, 555 F.3d at 519.

> sensitivity studio, model studio, escort service, escort or any other term
> of like import;

§ 7-51-1102(6) (line breaks added).  An establishment that conforms to the terms of any one of the three parts is subject to the Act's provisions.

Plaintiffs' complaint centers on the second part of this definition.  Plaintiffs contend that a grammatically correct reading requires treating the clause beginning with "or wherein" as a modifier for "any premises to which the public patrons or members are invited or admitted."  Appellants' Rep. Br. at 16.  This reading breaks up the provision as follows:

> Further, "adult-oriented establishment" means [1] any premises to which
> the public patrons or members are invited or admitted and
>
> [2A] that are so physically arranged as to provide booths, cubicles,
> rooms, compartments or stalls separate from the common areas of the
> premises for the purpose of viewing adult-oriented motion pictures,
>
> or [2B] wherein an entertainer provides adult entertainment to a member
> of the public, a patron or a member, when such adult entertainment is
> held, conducted, operated or maintained for a profit, direct or indirect.

So construed, either [1] & [2A] *or* [1] & [2B] suffice to make an establishment an adult-oriented one.  That means that "[a]ny place which presents adult entertainment is, by virtue of that fact an adult-oriented establishment and subject to the full force of the act . . . ."  Appellants' Br. at 36.

Under this interpretation, the definition of "adult entertainment" becomes crucial to determining the scope of the Act.  Broken up into its logical components, that definition reads:

> "Adult entertainment" means [1] *any exhibition of any* adult-oriented
> motion picture, live performance, display or dance of any type,
>
> [A] that has as a principal or predominant theme, emphasis, or portion of
> such performance,

[i] any actual or simulated performance of specified sexual activities[8] or

[ii] exhibition and viewing of specified anatomical areas,[9]

[iii] removal of articles of clothing or appearing unclothed,

[iv] pantomime,

[v] modeling, *or*

[vi] any other personal service offered customers;

§ 7-51-1102(3) (line breaks, numeration, and emphasis added). Plaintiffs point to two problems within this definition that, they claim, render the Act unconstitutionally overbroad when combined with the definition of "adult-oriented establishment."

First, there is no explicit requirement that adult entertainment be *regularly* presented by or constitute *a principal use* of an establishment, in order for an establishment to be subject to the Act under the second part of the "adult-oriented establishment" definition. An establishment is subject to the Act if it "invites or admits" "public patrons or members" onto its premises, "wherein an entertainer provides adult entertainment," § 7-51-1102(6), defined as "*any* exhibition of any adult-oriented motion picture, live performance, display or dance of any type, that has as a principal or predominant theme" *any one* of the six listed activities [i] – [vi], § 7-51-1102(3). On Plaintiffs' reading, an establishment that offers "any" *single* performance, whose principal theme involves, for instance, the exhibition of specified anatomical areas, would be subject to the Act's requirements.

---

[8]"Specified sexual activities" are further defined to mean:

(A) Human genitals in a state of sexual stimulation or arousal;
(B) Acts of human masturbation, sexual intercourse or sodomy; or
(C) Fondling or erotic touching of human genitals, pubic region, buttocks or female breasts.

Tenn. Code Ann. § 7-51-1102(27).

[9]"Specified anatomical areas" are further defined to mean:

(A) Less than completely and opaquely covered:
    (i) Human genitals;
    (ii) Pubic region;
    (iii) Buttocks; and
    (iv) Female breasts below a point immediately above the top of the areola; and
(B) Human male genitals in a discernibly turgid state, even if completely opaquely covered;

Tenn. Code Ann. § 7-51-1102(24).

Second, Plaintiffs point out that a wide range of expressive conduct suffices to bring a performance or display within the scope of "adult entertainment." Appellants' Br. at 39. The themes that bring a performance under the umbrella of "adult entertainment," Plaintiffs insist, include those that do not describe erotic adult entertainment exclusively but are also characteristic of mainstream artistic expression. At the preliminary injunction hearing, Plaintiffs presented the testimony of Dr. Judith Hanna, a cultural anthropologist at the University of Maryland, who testified that there are "unlimited numbers" of "recognized performances" outside the adult-entertainment setting, whose predominant themes include nudity, simulated sex, and erotic touching between performers, and therefore, fit the definition of "adult entertainment."[10] Plaintiffs further submit that each of the expressive activities listed – including "pantomime," "modeling," or "any other personal services offered customers" – suffices *on its own* to classify a performance as adult entertainment, so long as that activity constitutes a principal or predominant theme of the performance. Entertainment would be "adult," they argue, even if the removal of some articles of clothing, pantomime act, or modeling at issue did not involve "specified sexual activities" or the exhibition of "specified anatomical areas."

In sum, Plaintiffs argue that the *content* of *an individual performance* determines whether or not the Act is applicable to an *establishment* staging that performance. As a consequence, numerous mainstream artistic venues that contemplate including in their program even a single film, opera, ballet, or dance performance that fits the letter of the "adult entertainment" definition, are likely to be chilled from engaging in protected expression.

---

[10]Dr. Hanna offered numerous examples of ballet, dance, dramatic, and operatic performances, whose predominant themes conform to the principal or predominant themes listed in the definition of "adult entertainment," such as nudity, simulated sex, and touching between performers. In addition to performances frequently cited in similar law suits such as *Oh, Calcutta!*, *Salomé*, and *Hair*, Dr. Hanna identified and described, *inter alia*, the following: George Balanchine's *Prodigal Son* ballet, which culminates in "an erotic encounter . . . that's portrayed on stage," involving "touching of the body"; Balanchine's *Bugak*[u], whose main theme is erotic, and which culminates in a consummation of marriage; a ballet, *Mutations*, and dance performances, *Map Me* and *Untitled*, that are performed in the nude; as well as a number of others.

Were Plaintiffs' performance-based interpretation of the Act's scope the only plausible reading, the Act would be overly broad on its face. If "adult entertainment" sweeps in mainstream artistic performances *and* if the presentation of a single performance suffices to subject an establishment to the Tennessee Act, then the Act applies to precisely the set of establishments that doomed the statutes noted earlier, which were invalidated by this and other circuit courts. *See Odle*, 371 F.3d at 399; *Triplett Grille*, 40 F.3d at 136; *Conchatta Inc.*, 458 F.3d at 266; *Carandola, Ltd.*, 303 F.3d at 516; *Ways*, 274 F.3d at 519.[11]

Facial invalidation is still inappropriate, however, if the statute is "readily subject to a narrowing construction by the state courts," *Erznoznik v. Jacksonville*, 422 U.S. 205, 216 (1975). "The key to application of th[e] [narrowing construction] principle is that the statute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements." *American Booksellers Ass'n*, 484 U.S. at 397. While we will not rewrite a state or local law, neither will we "assume that state courts would broaden the reach of a statute by giving it an 'expansive construction.'" *Richland Bookmart v. Nichols*, 137 F.3d 435, 441 (6th Cir. 1998). And, as we noted in the context of a related Tennessee statute, the presumption that state courts will favor the narrower of two plausible constructions "is consistent with Tennessee law that provides that such regulation of speech should be construed narrowly." *Ibid.* (citing *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 526 (Tenn. 1993)).

Defendants put forth an alternative construction of the challenged provisions and reject Plaintiffs' claim that the Act sets up a performance-based standard for regulating adult-oriented businesses. The second part of the "adult-oriented establishment"

---

[11]As noted *supra* at 8–9 and as we explained in *Odle*, a law is overbroad because it fails to "except 'mainstream' artistic or entertainment venues," where protected expression that is "unlikely to spawn harmful secondary effects" is presented – not because it fails to except *other* public places where no protected expression is featured. 421 F.3d at 396; *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 516 (4th Cir. 2002) (explaining that a North Carolina statute was overbroad not because it applied to *many* sites "far beyond bars and nude dancing establishments," but because it applied specifically to sites where mainstream artistic expression commonly takes place). Thus, the fact that the Act now before us purports to apply only to public venues that provide "adult entertainment" – and not to all public places or all venues that sell liquor – does not mean that this Act threatens fewer potentially impermissible applications than did the statutes in *Odle* or *Carandola*.

definition, Defendants argue, should not be read to mean that an isolated presentation of "adult entertainment" suffices to subject a business to the Act's regulation. Instead, the last clause, beginning with "or wherein" should be read as modifying "booths, cubicles, rooms, compartments or stalls," rather than "premises." Appellees' Br. at 28-9. Shelby County would read the provision as follows:

> Further, "adult-oriented establishment" means [1] any premises to which the public patrons or members are invited or admitted and that are so physically arranged as to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises
>
> [2A] for the purpose of viewing adult-oriented motion pictures,
>
> or [2B] wherein an entertainer provides adult entertainment to a member of the public, a patron or a member, when such adult entertainment is held, conducted, operated or maintained for a profit, direct or indirect.

That is, providing "adult entertainment" [2B] will only make an establishment "adult-oriented" if entertainment is conducted in some kind of compartments separated from the common area [1]. This reading considerably reduces, if not completely eliminates, the alleged regulatory burden on mainstream artistic performances, since such are not commonly conducted on premises with the specified interior arrangement.

We have noted that a limiting or narrowing construction of statutory language is sustainable when "an express exception in the law's text or *other specific language* made the law 'readily susceptible'" to such a construction. *Odle*, 421 F.3d at 396-97 (emphasis added). This Act does not have an "express exception" for performances that have serious artistic value or establishments devoted principally to offering such performances. *Cf. Farkas v. Miller*, 151 F.3d 900, 902 (8th Cir. 1998). However, the Act does contain "specific language" that lends itself to two meanings. We agree with Plaintiffs that Defendants' narrowing construction is the less grammatical of the two plausible interpretations of the language. We disagree, however, with the proposition that grammatical inelegance makes an interpretation unfair or unsustainable. Nor does the proposed narrowing construction require this court to trample on the principles of federalism by "rewriting" a state law. On the contrary, principles of federalism lead us

to take seriously the declaration of Tennessee courts that regulations of speech are to be construed narrowly.  *See Richland Bookmart*, 137 F.3d at 441(citing *Davis-Kidd Booksellers, Inc.*, 866 S.W.2d at 526).  We have explained that it would "be improper for this Court to *supply* limiting language . . . in order to preserve [a law's] constitutionality." *Triplett Grille*, 40 F.3d at 136 (emphasis added).  The Tennessee Act does not compel us to "supply" limiting language.  At most, it requires that we treat the comma between "pictures" and "or wherein" as a  drafting oversight, of the kind that would normally be remedied by enclosing it in brackets and denoting it with "sic."[12] Absent any other textual signals that the comma was intended to broaden the reach of the Act, there is no rule of law that compels us to assert the strictest tenets of English grammar over the demonstrable intent of the legislators.[13]

The central inquiry in overbreadth analysis is whether protected expression will be burdened by the actual enforcement of the Act or chilled by virtue of its sheer presence on the books.  With regard to the former, we are persuaded that the risk of *actual* enforcement of the Act against mainstream artistic establishments is quite low: unlike the lawmakers of Akron in *Triplett Grille*, 40 F.3d at 131, and Decatur County in *Odle*, 421 F.3d at 396, who conceded that their regulatory schemes applied to mainstream artistic performances, Tennessee and Shelby County disavow such a broad reading of this Act, *see* Appellees' Br. at 38–39.[14]  With regard to the latter risk, we seriously doubt that operators of any mainstream artistic venue are likely to scrutinize the provisions of a regulatory scheme aimed at "*adult-oriented* businesses," conclude

---

[12]As we do with statutory language routinely.  *See, e.g., DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 406 (6th Cir. 1997); *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 558 (6th Cir. 2006).

[13]Indeed, established principles of statutory construction counsel that "the strict language" of a statute yields to "the intention of the drafters," should that intention be "demonstrably at odds" with the results obtained by strict interpretation.  *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

[14]Cases of overzealous enforcement against mainstream artistic venues, moreover, would and should invite litigation by the affected parties on an as-applied basis.  *New York v. Ferber*, 458 U.S. 747, 773–74 (1982) (stating that when overbreadth is not substantial, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which [a law's] sanctions, assertedly, may not be applied") (quoting *Broadrick v. Oklahoma,* 413 U.S. 601 (1973)); *see also N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988).

that the scheme will require their venues to obtain a license if certain performances are offered, and be thereby deterred from staging *Salomé*, *Prodigal Son*, or *Bugaku* – on the basis of a single comma.

We think that the definition of "adult-oriented establishment" is "readily susceptible" to the narrowing construction that Defendants advocate. We recognize that this does not automatically address the second problem with the definition of "adult entertainment" – the apparent self-sufficiency of a predominant emphasis on "pantomime," "modeling," or "any other personal service offered customers" to transform a performance or exhibition into "adult entertainment." "[T]he risk that this definition might chill a range of protected speech" may have led us "to find it unconstitutionally overbroad *if it stood alone*." *Deja Vu of Nashville, Inc.*, 274 F.3d at 388 (emphasis added). If we read "adult entertainment" in conjunction with the narrowly construed definition of "adult-oriented establishment," the hypothesized unconstitutional applications dwindle in number, if not disappear. One cannot readily imagine a non-adult modeling session or non-erotic pantomime performance taking place in individualized booths anymore than one can imagine Balanchine's ballets screened routinely in such a setting.

The domain of expressive activities triggering the "adult entertainment" label may be limited in yet another manner. In two decisions analyzing the Tennessee Act, a federal district court found that the definition of "adult entertainment" is not overbroad when the clause "any other personal service offered customers" is read in context. "The phrase read in context of the entire definition clearly *pertains* and is *limited to* that entertainment 'which has a significant or substantial portion of such performance, any actual or simulated performance of specified sexual activities or exhibition and viewing of specified anatomical areas." *Belew, et al. v. Giles County Adult-Oriented Establishment Board*, *et al.*, No. 1-01-0139, slip op. at *66 (M.D. Tenn. Sept. 30, 2005) (emphasis added); *Friedman, et al. v. Giles County Adult-Oriented Establishment Board, et al.*, No. 1-00-0065 (M.D. Tenn. Sept. 29, 2005). We find that this is a sensible way to interpret all of the expressive activities contained in the "adult entertainment"

definition, which may appear devoid of sexually explicit content in isolation (*i.e.*, removal of indeterminate articles of clothing, pantomime, modeling, or other personal services). Following "the commonsense canon of *noscitur a sociis* – which counsels that a word is given more precise content by the neighboring words with which it is associated," *Williams*, 128 S. Ct. at 1839, these activities constitute "adult entertainment" only when they implicate "specified sexual activities" or "specified anatomical areas."[15]

We find that the Tennessee Act is readily susceptible to a narrowing construction that would clearly except mainstream artistic venues from the licensing and regulatory scheme. Because we find it improbable that any performances of serious artistic value qualifying as "adult entertainment" would be staged in individualized booths, the number of ostensibly impermissible applications of the Act is negligible and does not rise to the level of real and substantial overbreadth. The district court did not err, therefore, in denying the preliminary injunction on the basis that Plaintiffs did not demonstrate a substantial likelihood of success in their challenges to the definitions of "adult cabaret," "adult-oriented establishment," and "adult entertainment."

**D**

Plaintiffs' second challenge is to some of the activities prohibited by the Act. The Act contains the following prohibitions:

> (a) No operator, entertainer or employee of an adult-oriented establishment, either on the premises or in relation to the person's role as an operator, entertainer, or employee of an adult-oriented establishment, shall permit to be performed, offer to perform, perform,

---

[15] The same "commonsense canon" serves to make more precise the meaning of "rooms" in the challenged portion of the "adult-oriented establishment" definition. At oral argument, Plaintiffs attempted to argue that even if Defendants' narrowing construction is accepted, the Act is still overbroad because it applies to establishments "so physically arranged as to provide . . . rooms . . . separate from the common areas of the premises," wherein adult entertainment is presented. Plaintiffs argued that the several separate auditoria in mainstream movie theaters, for example, are such "rooms." We disagree, and find that "rooms" must be interpreted by reference to the neighboring terms (*i.e.*, booths, cubicles, compartments, and stalls). *See Williams*, 128 S. Ct. at 1839 (narrowing the meaning of "promotes" and "presents" to activities with a "transactional connotation," by reference to the other verbs in the series – "advertises," "distributes," and "solicits").

or allow patrons to perform sexual intercourse or oral or anal copulation or other contact stimulation of the genitalia.

(b) No operator, entertainer or employee of an adult-oriented establishment shall encourage or permit any person upon the premises to touch, caress or fondle the breasts, buttocks, anus or genitals of any operator, entertainer or employee.

(c) No entertainer, employee, or customer shall be permitted to have any physical contact with any other on the premises during any performance and all performances shall only occur upon a stage at least eighteen inches (18") above the immediate floor level and removed at least six feet (6') from the nearest entertainer, employee, or customer.

(d)   (1) No employee or entertainer, while on the premises of an adult-oriented establishment, may:

(A) Engage in sexual intercourse;

(B) Engage in deviant sexual conduct;

(C) Appear in a state of nudity; or

(D) Fondle such person's own genitals or those of another.

(2) For the purpose of this section, "nudity" means the showing of the human male or female genitals or pubic area with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

Tenn. Code Ann. § 7-51-1114. Plaintiffs contend that the prohibitions contained in § 7-51-1114(b) and § 7-51-1114(c) are overbroad, especially in the context of the other prohibitions in § 7-51-1114. The prohibitions are allegedly overbroad because they apply to mainstream performances of artistic value – on Plaintiffs' reading of the Act's "adult-oriented establishment" definition – and would effectively prohibit all the performances about which Dr. Hanna testified. Since we determine that the Act is susceptible to a narrowing construction that excepts mainstream artistic venues from its reach, this line of argument is unavailing.

Further, Plaintiffs claim that the prohibitions are overbroad even if applied only to adult-oriented venues such as their own adult cabarets because the breadth of physical contact prohibited goes beyond what is necessary to address secondary effects and

"impermissibly limits the expressive palette available to [erotic] performers." Appellants' Rep. Br. at 14. In particular, § 7-51-1114(b) is allegedly overbroad because it prohibits a performer's "touching" or "caressing" herself or himself in the course of her or his performance. Such restrictions, Plaintiffs assert, "directly circumscribe[] the potential message" inherent in erotic dancing: Dr. Hanna testified that, for example, a prohibition on "plac[ing] hands on the person's hip [or] buttocks . . . would be silencing part of their artistic expression," as would a prohibition on "calling attention to [one's] body parts . . . [by] plac[ing] hands down the sides of [one's] breasts or cup[ping] them." Appellants' Br. at 24. Similarly, the prohibition on any contact, no matter how innocent, between performers during a performance contained in § 7-51-1114(c), ("[n]o entertainer . . . shall be permitted to have any physical contact with any other on the premises during any performance"), is alleged to be overbroad for the same reasons. The impact of these measures is claimed to be all the more burdensome because "[n]othing in the Act limits the application of these restrictions to only those occasions when performers are scantily clad": a performer "may not touch a fellow dancer in a beekeeper's suit." Appellants' Rep. Br. at 12. So burdening the expressive elements of erotic dance, Plaintiffs urge, is unrelated to the Act's stated purposes and needlessly suppresses protected erotic expression.

We have consistently recognized that "nude or nearly nude dancing conveys an endorsement of erotic experience, and is a protected form of expression[,] in the absence of some contrary clue." *Richland Bookmart, Inc.*, 555 F.3d at 528 (quoting *DLS, Inc.*, 107 F.3d at 409) (internal quotation marks omitted). Nonetheless, a content-neutral time, place, or manner regulation may burden this form of expression so long as the burden is no greater than necessary to advance a legitimate government objective, *O'Brien*, 391 U.S. at 377, and does not unreasonably limit alternative avenues of communication, *Renton*, 475 U.S. at 47. Since the challenge to these provisions is brought on the grounds of overbreadth, we must also determine whether the impermissible applications – *i.e.*, those that are unnecessary to advance the interests at

hand and/or that excessively limit alternative avenues – are substantial in number, absolutely and relative to permissible applications.

Considering the constitutionality of nudity bans in adult establishments, we have invoked the Supreme Court's determination that "nudity itself is not essential to the eroticism that brings dancing under the protection of the First Amendment." *Richland Bookmart, Inc.*, 555 F.3d at 530. Therefore, a ban on nudity does not effect a "complete ban on expression," but "merely," and not unreasonably, "limits one particular means of expressing the kind of erotic message being disseminated." *Ibid.* (internal quotation marks and citation omitted); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 292-93 (2000).

The district court, relying on the Tennessee Court of Appeals' decision in *American Show Bar Series, Inc. v. Sullivan County*, 30 S.W.3d 324 (Tenn. Ct. App. 2000), suggested that both nudity and the prohibited touching are "beyond the 'expressive scope of dancing itself' and . . . not protected by the First Amendment." (citing *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1253 (5th Cir. 1995)). In other words, the district court and the Tennessee Court of Appeals deemed these restrictions to be constitutional because the expressive elements in the prohibited physical contact are so minor as to be negligible, and do not interfere with a performer's communication of eroticism to its audience. Whatever modicum of expressive conduct is proscribed, "nothing in constitutional jurisprudence . . . suggest[s] that patrons are entitled under the First Amendment to the maximum erotic experience possible." *American Show Bar*, 30 S.W.3d at 340 (quoting *Threesome Entertainment v. Strittmather*, 4 F. Supp. 2d 710, 724 (N.D. Ohio 1998)).

Plaintiffs contest this characterization of the prohibited activities and invoke the Seventh Circuit's reasoning in *Schultz.* 228 F.3d 831. In that case, the Seventh Circuit determined that a prohibition on the "*depiction* of specified sexual activities"[16] burdened

---

[16]Defined to include "'the fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts,' sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, masturbation, or sodomy[,] and excretory functions in connection with sexual activity."

the protected elements of erotic expression much more than a minimal-attire requirement imposed by a nudity ban. *Schultz*, 228 F.3d at 847-48 (emphasis added). While requiring dancers to wear pasties and G-strings "is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message," "restricting the particular movements and gestures of the erotic dancer . . . unconstitutionally burdens protected expression[,]" because it "deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance and thereby interferes substantially with the dancer's ability to communicate her erotic message." *Schultz*, 228 F.3d at 847.

Before we determine whether and to what extent the challenged prohibitions interfere with the communication of an erotic message, however, we need to identify with greater care what exactly is prohibited. *See Williams*, 128 S. Ct. at 1838 ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). Reading § 7-51-1114 as a whole, we are not persuaded that § 7-51-1114(b) must be interpreted in the manner Plaintiffs proffer. The provision prohibits an "operator, entertainer or employee" from "*encourag[ing] or permit[ting]* any person upon the premises to touch, caress or fondle" the listed anatomical areas of "any operator, entertainer or employee." (emphasis added). If the drafters intended to prohibit self-touching, the chosen construction is ill-fitted to the task: to forbid an entertainer from touching herself, one would not commonly direct her not to "*encourage or permit*" herself "to touch or fondle" herself. A straight-forward way to formulate such a prohibition is to mandate, for example, that "no employee or entertainer . . . may[] [f]ondle such person's own genitals" or other anatomical areas — as the drafters of the Act did in § 7-51-1114(d). The latter section illustrates that the drafters knew how to formulate an unambiguous prohibition on touching or fondling oneself and others. Moreover, there is no good reason to suppose that the direct and unambiguous prohibitions in § 7-51-1114(d) are not exhaustive.

---

228 F.3d at 836-37.

We read the challenged section 1114(b) as an enactment of vicarious liability for operators or employees who *encourage or permit* patrons or entertainers to touch *other* entertainers, perhaps without the latter's explicit consent. All the provisions in section 1114 that concern touching or physical contact are intended to further one goal: the elimination of the kind of sexual contact that is typically attended by adverse secondary effects, such as disease or prostitution. The Act advances that goal in more than one way: first, it explicitly prohibits employees and entertainers from certain kind of touching of self and others, § 7-51-1114(d)(1)(D) (no "fondling" of one's "own genitals or those of another"), § 7-51-1114(d)(1)(B) (no engaging in "deviant sexual conduct"), § 7-51-1114(a) (no performing "sexual intercourse or oral or anal copulation or other contact stimulation of the genitalia"). Second, the Act also includes prophylactic measures that diminish the opportunities for the occurrence of prohibited sexual contact. The six-foot buffer zone is one such measure: it obviously makes it difficult for any contact to occur between persons separated by that distance, but does not in itself prohibit contact. *See DLS, Inc.*, 107 F.3d at 411.

The prohibition on "encouraging or permitting" physical contact is another such measure: it makes it difficult for operators and employees to circumvent the ban on sexual contact by encouraging patrons to initiate sexual contact with entertainers or other employees without the latter's explicit complicity. Section 7-51-1114(b) does not effect any additional prohibitions on physical contact beyond what is already prohibited in other sections. It merely spells out that an employee will be in violation of the Act for encouraging prohibited conduct even if the employee did not engage in it himself, mirroring the general statement of responsibility for violations of the Act. *See* § 7-51-1113(d) (making an operator responsible for failure to "exercise due diligence in taking reasonable efforts to prevent acts or omissions of any entertainers or employees constituting a violation" of the Act).

That the prohibition on encouraging or permitting contact applies to more anatomical areas than the direct prohibitions on contact in other sections is not problematic: it is no different from "*the addition* of a buffer zone to the ban on contact"

we addressed in *DLS, Inc.*, 107 F.3d at 411 (emphasis added). Both prophylactic measures are reasonably believed to be "necessary to achieve" the goal of preventing prohibited contact, "given the repeated violations of the no-contact rule," and the "difficult[y] [of] determin[ing] . . . who was responsible" for the violations. *Ibid.* It is not unreasonable to require that an operator refrain from encouraging a patron to touch a performer's breast, for example, because that action is likely to lead to the kinds of sexual contact that is explicitly prohibited.[17] Because we do not interpret this provision as creating any additional constraints on a performer's own movements, we do not think it "regulat[es] nude dancing with such stringent restrictions that the dance no longer conveys eroticism nor resembles adult entertainment," *Schultz*, 228 F.3d at 847, and is thus distinguishable from the provision considered in *Schultz*.

The second prohibition Plaintiffs challenge also warrants more careful construction: "No entertainer, employee, or customer shall be permitted to have any physical contact with any other on the premises during any performance," and to that effect, "all performances shall only occur . . . removed at least six feet (6') from the nearest entertainer, employee, or customer." § 7-51-1114(c). This provision should be read in the same manner as we read a similarly-worded provision in *Deja Vu of Nashville*[18] that concerned entertainer-customer contact:

---

[17]It is also possible – although not necessary – to read the provision as directing *third parties* (*i.e.*, operators or non-performing employees) not to encourage or permit an entertainer to touch *herself* in the course of her performance, even in a manner that the entertainer herself is not directly prohibited from doing. We think that common sense counsels against such an interpretation. Here too, however, any possible unreasonable enforcement of the provision should invite litigation by the affected parties on an as-applied basis. "[W]hatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which [a law's] sanctions, assertedly, may not be applied." *Ferber*, 458 U.S. at 773-74 (citation omitted).

[18]The provision in question read:

> No customer shall be permitted to have any physical contact with any entertainer on the licensed premises while the entertainer is engaged in a performance of live sexually oriented entertainment. All performances of live sexually oriented entertainment shall only occur upon a stage at least eighteen inches above the immediate floor level and removed at least three feet from the nearest customer.

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 396 (6th Cir. 2001).

Rather than reading the provision as enacting two separate requirements, we read it as a *single mandate*, with the "no touch" portion setting forth a broad policy statement that no contact between dancers and customers shall occur during performances, and the "buffer zone" rule showing the specific way to implement that policy by prohibiting clubs from allowing customers within three feet of the stage during dances. Therefore, the provision places a duty not on the entertainer to avoid touching customers, but on the owners and operators of clubs to protect entertainers from being touched by customers by requiring customers to stay three feet away from the stage. . . . It would simply be nonsensical for [the government] to put the onus of customer control on the entertainer who is already removed at least three feet from the customer, is engaged in live entertainment, and is, by definition, incapable of preventing an approaching customer from touching her without engaging in the prohibited touching herself.

*Deja Vu of Nashville, Inc.*, 274 F.3d at 397-98 (emphasis added). Likewise, the provision before us requires only that a six-foot distance between an entertainer and any other entertainer, employee, or customer be assured during performances, and that performances take place on an eighteen-inch stage. These spatial requirements ensure that no contact occurs between a performer and any other person during a performance.[19] Analogous to § 7-51-1114(b), the six-foot buffer-zone and eighteen-inch elevation rules spell out what "due diligence" requires of operators to prevent violations of the explicit prohibitions of the Act. Because the first clause does not impose additional prohibitions or duties beyond the buffer and height requirements contained in the second clause, this provision is identical to the one we upheld in the context of an as-applied challenge in *DLS, Inc*. 107 F.3d at 413.

Plaintiffs' efforts to distinguish our decision in *DLS, Inc*. on the basis that we did not adjudicate an overbreadth challenge, Appellants' Rep. Br. at 15, are unpersuasive. In that case, we found that Chattanooga's six-foot buffer requirement survived

---

[19]We do not think the provision intends to prohibit all contact *among customers* or *non-performing employees* beyond what is explicitly prohibited in other sections, as an exceedingly literal reading may suggest. In any case, neither Plaintiffs nor Defendants address the possibility that the County may penalize adult establishments for casual contact among their customers or non-performing employees during a performance. Accordingly, we do not consider this hypothetical possibility sufficiently "actual" to weigh in our overbreadth analysis, and leave any contentious applications of this provision to as-applied adjudication.

intermediate scrutiny under *O'Brien* and *Renton*: it furthered important content-neutral state interests of crime- and disease-prevention, the evidence relied on by Chattanooga made it "reasonable to conclude that the six-foot rule would further the state interests," and it was "sufficiently narrowly tailored to be [a] valid regulation under the First Amendment." *DLS, Inc.*, 107 F.3d at 410-3.  Since Chattanooga's buffer-zone requirement did not impermissibly burden expression in adult cabarets similar to Plaintiffs', such a requirement cannot form a basis for a successful overbreadth attack – at least not without a demonstration of a "substantial number" of unconstitutional applications beyond those considered in *DLS, Inc.  See Richland Bookmart, Inc.*, 555 F.3d at 532; *see also 729, Inc.*, 515 F.3d at 492 (holding that a requirement "that an entertainer stay at least five feet away from areas being occupied by customers for at least one hour after the entertainer performs semi-nude on stage" survives intermediate scrutiny); *Deja Vu of Nashville, Inc.*, 274 F.3d at 396 (holding that a prohibition on customer-entertainer contact during performances and a three-foot buffer zone survives intermediate scrutiny).

    Plaintiffs do not bring to our attention any other allegedly unconstitutional applications beyond those deemed insufficient to prevail on an as-applied challenge in *DLS, Inc*.  Therefore, the district court did not err in finding that Plaintiffs did not establish a substantial likelihood of prevailing on the merits of their overbreadth challenge to § 7-51-1114(b) and § 7-51-1114(c).

**E**

    Next, Plaintiffs claim that the definitions of "adult cabaret" and "adult entertainment" render the Act unconstitutionally vague.  Plaintiffs complain that they cannot  "ascertain[] where the outer boundaries of the Act lie," such that they may "shape their conduct so as to avoid them."  Appellants' Br. at 48.  The complaints of vagueness are coterminous with Plaintiffs' complaints of overbreadth.  The definition of "adult cabaret" is vague, Plaintiffs allege, because there is nothing in the Act "to explain[] or cabin the phrase 'entertainment of an erotic nature.'"  Appellants' Br. at 50.

Because we found that the definition of "adult cabaret" is not overbroad, we can readily supply the explanatory or "cabining" language that Plaintiffs assert is wanting. Establishments that "feature entertainment of an erotic nature, including exotic dancers, strippers," and so on, are merely examples, and do not augment the reasonably clear meaning of "adult cabaret" offered in the first sentence of that definition. It is therefore unnecessary to ask the questions to which Plaintiffs intimate there are no answers (*e.g.*, "What is an exotic dancer?"). *Ibid.*

The definition of "adult entertainment" is the next target of a vagueness charge. Recalling that this term means "any exhibition . . . that has as a principal or predominant theme . . . any actual or simulated performance of specified sexual activities[,] . . . removal of articles of clothing or appearing unclothed," Plaintiffs intend to demonstrate vagueness by posing questions based on that definition: "Would an adult nightclub be subject to the Act if dancers there began their performances in street clothes or evening gowns and stripped to bikini bathing suits?"; "Is it adult entertainment . . . [t]o remove one's coat and hat on stage? To shed an outer garment?" Appellants' Br. at 51.

Under the narrowing construction to which the Act is readily susceptible, all these questions are readily answered. If the "stripping to bikini bathing suits" is taking place in "booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises" and is staged for profit "direct or indirect," then the establishment is subject to the Act. In sum, a narrowing construction sufficiently clarifies the parts of this Act allegedly contaminated by vagueness. Thus, the district court did not err in holding that a vagueness challenge is not likely to succeed on the merits.

**F**

Plaintiffs' last claim – that the Act's requirements will result in a drastic reduction in the "quantity and accessibility of speech," Appellants' Br. at 53 – is also predicated on the acceptance of Plaintiffs' overbreadth and vagueness claims. Since we do not accept Plaintiffs' overly literal and expansive reading of the Act's terms, we are

equally unpersuaded that the Act's provisions are "so onerous" as to cause the majority of Memphis's nightclubs to "cease presenting adult entertainment entirely."

Finally, Plaintiffs contend that the district court erred in its determination that the balance of equities disfavored a temporary injunction in their favor. Because the district court correctly determined that Plaintiffs have not demonstrated a likelihood of success on the merits of their claim, the issue of balancing equities is moot. *See Hamilton's Bogarts, Inc.*, 501 F.3d at 649 ("[I]n a First Amendment case, the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because, as in this case, the issues of the public interest and harm to the respective parties [i.e. balancing equities] largely depend on the constitutionality of the statute" (internal quotation marks and citation omitted)).

## III

For the foregoing reasons, we AFFIRM the district court's denial of a preliminary injunction.

---

**CONCURRING ONLY IN THE JUDGMENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring only in the judgment. I believe that the district court did not abuse its discretion by denying the plaintiffs' motion for a preliminary injunction. I do not join the majority's opinion, and I concur solely in the judgment affirming the district court's judgment that the plaintiffs have not satisfied the requirements for a preliminary injunction of the challenged provisions, Tennessee Code Annotated § 7-51-1114(b) & (c).